**ALLIED KID COMPANY et al.**
v.
**The UNITED STATES.**
No. 48338.

United States Court of Claims.
July 12, 1956.

# 634

Martin P. Detels, New York City, for plaintiff. Watters & Donovan, Charles W. Harvey, and Joseph J. Magrath, 3d, New York City, were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Melford O. Cleveland, Wilton, Ala., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues to recover just compensation for certain cargo which was unloaded from the vessel Sea Witch at Manila, Philippine Islands, in December 1941.

Although the petition in this case lists 41 plaintiffs, all claiming to be the owners of varying quantities and types of cargo unloaded from The Sea Witch at Manila, only two claims belonging to the Hongkong & Shanghai Banking Corporation are presently before the court for determination. One of these claims involves 1,735 cases of soup, and the other involves 26 packages of photographic supplies. These claims have been selected as test cases, and our decision as to them will indicate the disposition to be made of the remaining claims.

Plaintiff is, and at all times material to this action was, a corporation doing business under the laws of the Crown Colony of Hongkong, with agencies in the United States.

The Sea Witch arrived in Manila from the United States on or about November 26, 1941, with a general cargo, including plaintiff's property, destined for Hongkong, Shanghai, and Manila. The vessel immediately began to unload cargo consigned to Manila and completed such discharge on about December 1. Certain cargo originating in Manila and destined for Hongkong and Shanghai was then loaded on the vessel and she was moved out into the stream to an anchorage, ready to sail on about December 3. However, she was denied permission to leave by Naval authorities because no vessels were being allowed to clear for Chinese or Japanese ports at that time, in anticipation of the early outbreak of war between this country and Japan.

On or about December 8 or 9, unidentified officer personnel from the Army Quartermaster Headquarters boarded The Sea Witch and examined her manifest and cargogram. The evidence is somewhat vague as to what was said and done by these officers; but the testimony indicates that the only cargo which they stated a definite desire to take was certain pipe and plate located in the bottom of a hold. The vessel was then moved at the direction of the military authorities to pier 7 in the Manila Port Terminal Area, and her entire cargo unloaded. The evidence does not reveal whether all of the cargo was unloaded merely to get to the pipe and plate or whether the military authorities wanted some of the other cargo. The unloading was completed on or about December 19, and The Sea Witch left Manila for the East Indies.

The circumstances and conditions existing in the Manila Port Terminal Area at the time pertinent to plaintiff's claim are set out fully in the court's findings of fact, and are also discussed in Hongkong & Shanghai Banking Corporation v. The United States, Ct.Cl., 145 F.

Supp. 631. The only substantial difference between the facts of the present case and those of the Hongkong case is that in the present case military personnel boarded The Sea Witch to examine her cargo, and she was directed by the military to discharge her cargo, whereas in the Hongkong case the vessel involved discharged her cargo under orders from her owners.

Plaintiff alleges that there was a taking of its soup and photographic supplies within the meaning of the Fifth Amendment, and that it is entitled to recover just compensation for such taking.

Unless a taking of plaintiff's property occurred when the unidentified military personnel boarded The Sea Witch and examined her cargo, or when she was directed by the military to discharge her cargo, plaintiff's claims must fail for the reasons stated in the Hongkong case, supra. We think plaintiff has failed to establish a taking.

The evidence is not clear as to just what the military personnel said after they boarded the vessel. However, the evidence indicates that they were primarily interested in certain pipe and plate which were at the bottom of a hold. The soup and photographic supplies involved in this suit apparently were not mentioned and we do not think that the evidence establishes a taking of them at that time, or later.

Since the pipe and plate were at the bottom of a hold, it is possible that the military authorities ordered all of the cargo unloaded in order to get to them. On the other hand, it is possible that the military authorities intended to screen all of the cargo after it was unloaded in order to determine whether some other parts of it had a military use. In either case the mere order to unload the cargo did not mean that the military was taking plaintiff's property.

Once the cargo was unloaded, it was subject to the uncertainties described in the Hongkong case, supra, and for the reasons stated in that case plaintiff is not entitled to recover on its claims.

Plaintiff is not entitled to recover just compensation for its soup or photographic supplies, and its petition will be dismissed as to such cargo. All other claims set out in the petition will be dismissed for the reasons stated in this opinion.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff, the Hongkong & Shanghai Banking Corporation, one of the 41 plaintiffs in case number 48338, sues for the taking by defendant of 1,735 cases of soup and 26 packages of photographic supplies, etc., belonging to plaintiff, which were unloaded from the vessel Sea Witch onto pier 7 at Manila, Philippine Islands, in December 1941.

Although the court, on plaintiff's motion, previously ordered the issue of liability separated for trial from that of damages, with the consent of the parties the evidence has since been closed on all issues, both as to liability and damages, and the facts presented herein pertain to such issues.

The two claims presented here have been selected by the plaintiff as test cases. Decision in them will be determinative of all other claims in the petition.

2. Plaintiff is, and at all material times was, a corporation organized and doing business under the laws of the Crown Colony of Hongkong, and registered to do business in the State of New York through its New York agency, with its principal New York office and place of business in New York City. It also had an agency in San Francisco.

3. The laws of the Crown Colony of Hongkong permit citizens of the United

States to bring suit there against the Crown Colony.

4. The Sea Witch, operated by the United States Lines Company, arrived at Manila from the United States on or about November 26, 1941, with a general cargo destined for Hongkong, Shanghai, and Manila. Her normal route would have been from United States ports to Manila, Hongkong, Shanghai, and back to Manila, in that order, and thence down through the Dutch East Indies to Australia. Upon arriving at Manila the vessel immediately began to unload cargo consigned to Manila, completing such discharge about December 1. She then loaded certain cargo originating in Manila and destined for Hongkong and Shanghai, completing such loading in two or three days. She then moved out into the stream to an anchorage, ready to leave for Hongkong and Shanghai, but was denied permission by the Naval authorities to sail for those ports. No vessel had been allowed to clear Manila for Chinese or Japanese ports since a date prior to the arrival of The Sea Witch in Manila.

5. Sometime prior to the outbreak of war on December 9, while The Sea Witch remained at anchor in Manila Harbor waiting for permission to leave, that part of her cargo which had been taken on at Manila and which was bound for Hongkong and Shanghai, was unloaded onto lighters, but the evidence does not disclose the reason for this or at whose direction or discretion it was done. On or about December 8 or 9, unidentified officer personnel from the Army Quartermaster boarded The Sea Witch and examined her manifest and cargogram. The evidence is not clear as to what was said and done by these officers, but the testimony indicates that they expressed an intention to take certain pipe and plate located at the bottom of a hold. There is no evidence that the soup or photographic supplies in suit were mentioned by the officers at that time.

Thereupon the vessel was moved at the direction of the military authorities to pier 7 in the Manila Port Terminal Area and there unloaded, completing the discharge of its entire cargo on or about December 19. She then left Manila for the East Indies.

6. Shortly after December 8, 1941, orders were issued to the commanding officer of the Quartermaster Depot at Manila to take charge of all supplies of any military value in the Manila Port Terminal Area. The order embraced the supplies in warehouses, on docks and piers, and in vessels in the harbor. With permission of the Philippine Commonwealth Government which owned it, the Army established its control over the Port Terminal Area, including the piers, by posting guards on the piers and at certain stockpiles in the vicinity, and by occupying the Customs House opposite pier 5 as a control center for the Area. Nothing could leave the piers without Army permission. However, the Army authorities were anxious to keep the piers as clear as possible to allow room for incoming military cargoes that were anticipated but never arrived, and urged all local Philippine consignees to remove all property consigned to them for which the Army had no military use.

The evidence does not reveal whether or not plaintiff was requested to remove cargo belonging to it or whether it made any attempt to do so.

Incoming merchant vessels whose manifests revealed the presence in their cargoes of property of military use were required to discharge on the piers that part of their cargoes which was of military use. If property thus selected for military requisition or seizure was at the bottom of a ship, all cargo above it was removed when necessary to extricate the desired cargo. Once discharged, a rapid screening of the unloaded cargoes ensued. The property thought to have a military use was in some cases hauled off the piers and transported directly in military vehicles to military locations beyond the Area, and in other cases deposited temporarily in dumps within the Area for later removal. That part of the

property thought to have no military use was deposited in a large open storage site adjacent to the piers.

7. Although the orders to the Quartermaster Depot to take charge of all property within the Port Terminal Area directed that receipts be given for property so taken, due to the confusion and haste attending the program and the sudden requirements produced by the onset of war, the direction was ignored in many cases. In any event, such receipts as may have been given were lost or destroyed and no documentary records are now available which describe specifically the property taken by reference to identifying marks or other description.

8. On December 24 Manila was declared an "open city" and remaining military units proceeded to evacuate to Corregidor and Bataan, taking as many supplies with them as deficient water and land transportation facilities permitted. The Army succeeded in removing some military supplies from the Port Terminal Area, particularly in the period December 24–January 1. However, estimates vary widely as to what quantity was removed and what quantity was still present in the Area when the enemy arrived on or about January 2, 1942, and it is impossible to determine with accuracy the quantity actually removed. On or about January 1 the piers and warehouses in the Area were thrown open and the civilian population was permitted to remove everything it wished that remained. Efforts were made to destroy what was left to prevent it from falling into enemy hands. It is not possible to determine whether the property referred to in finding 1 was removed by the Army, taken by the civilian population, deliberately destroyed, or taken by the enemy. The only direct evidence that any of the cargo of The Sea Witch was taken for military use is the testimony of the Chief Mate who saw some of the cargo being put directly into military vehicles after being unloaded from the vessel, and other of the cargo being discharged into a shed.

9. On or about September 29, 1941, the Campbell Soup Company invoiced to Dodwell &. Co., Ltd., of Hongkong, China, 1,735 cases of soup at an invoice price of $6,712.58 C. I. F., Hongkong, including $978 for costs of ocean freight, marine, and war risk insurance, and miscellaneous shipping charges. The soup was shipped to Hongkong on The Sea Witch under bills of lading listing Campbell Soup Company as the "order of" consignee, with instructions to notify Dodwell & Co., Ltd., upon arrival in Hongkong. The soup, which was discharged at Manila under circumstances described in finding 5, was of military use to the Army in the Philippines.

10. Pursuant to irrevocable and without recourse letters of credit established by Dodwell & Co., Ltd., in Hongkong, Campbell Soup Company drew its bill of exchange on Dodwell & Co., Ltd., for the full invoice price of the soup and presented it to Hongkong's New York agency for payment. On or about October 27, 1941, Hongkong purchased the bill of exchange for its face amount of $6,712.58, and forwarded the same to its home office in Hongkong for collection from Dodwell. Although there is no direct evidence, it is reasonable to conclude that the sum was not collected from Dodwell.

11. Plaintiff was paid a sum covering its loss by The Insurance Company of North America after execution of a subrogation receipt and an agreement wherein the amount paid by the insurance company was denominated as an advance which was to be repayable to the insurance company if it was later established that the property was not lost while insured under a policy issued by the said insurance company and not as a result of perils insured against under the said policy.

12. On October 9, 1941, Deep Sea Export and Import Co., Inc., of New York, invoiced to Sun Co., Ltd., of Hongkong,

China, 26 cases of merchandise, as follows:

| | |
|---|---|
| 1 case unidentified photo supplies | $ 33.30 |
| 5 cases unidentified electrical appliances | 290.08 |
| 2 cases unidentified dental equipment ........$176.64 | |
| Cartage on dental equipment ........ 1.50 | |
| | 178.14 |
| 12 cartons paper cups & holders | 52.15 |
| 4 cases toy banks | 139.65 |
| 2 cartons razors ...... 278.08 | |
| Inland freight on razors .......... 2.92 | |
| Cartage on razors. .. 3.00 | |
| | 284.00 |
| Total | 977.32 |

To this were added charges of $88 for ocean freight, $37.35 for marine and war risk insurance, $27.60 for buying commission, and $1.48 for miscellaneous charges, making a total of $1,131.75. This material was shipped to Hongkong on the S. S. Sea Witch, under a bill of lading listing the consignee as "shipper," with instructions to notify Sun Co., Ltd., upon arrival. The photographic supplies, razors, and dental equipment, which were discharged at Manila under circumstances described in finding 5, were of military use to the Army in the Philippines at that time.

13. Pursuant to an irrevocable and without recourse letter of credit established by Sun Co., Ltd., in Hongkong, the Deep Sea Export and Import Co., Inc., drew its bill of exchange on Sun Co., Ltd., for the full invoice price, and presented it to Hongkong's New York agency, which purchased the same for $1,131.75 and forwarded the bill of exchange to its home office in Hongkong for collection from Sun Co., Ltd. Although there is no direct evidence, it is reasonable to conclude that the sum was not collected from Sun Co., Ltd.

14. Plaintiff was paid a sum covering its loss by the Union Marine & General Insurance Co., Ltd., after execution of a subrogation receipt and an agreement wherein the amount paid by the insurance company was denominated as an advance which was to be repayable to the insurance company if it was later established that the property was not lost while insured under a policy issued by the said insurance company and not as a result of perils insured against under the said policy.

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and all claims stated in its petition are dismissed.